Date signed October 30, 2013



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at GREENBELT

| In Re: | |
|---|---|
| Solomons One, LLC | Case No.   13-24475-TJC |
| Debtor | Chapter   11 |

## MEMORANDUM OF DECISION

Solomons One, LLC (the "Debtor") filed this chapter 11 petition with the consent of members holding 51 2/3% of the membership interests. V. Charles Donnelly and Deborah A. Steffen, members of the Debtor who opposed the filing, bring this motion to dismiss the bankruptcy case claiming that the Debtor's operating agreement is silent on the requisite consent needed to authorize a bankruptcy filing, and therefore Maryland law requires unanimous consent of the members to do so. The motion is opposed by the Debtor and the members who authorized the bankruptcy filing. They contend that the operating agreement authorizes a filing upon consent of members holding a majority of the interests. The court held a hearing on the motion on October 24, 2013. For the reasons stated herein, the court concludes that the petition was properly authorized in accordance with the Debtor's operating agreement, and will deny the motion to dismiss.

1

**Findings of Fact**.

*The Debtor and the Operating Agreement*.

The Debtor is a limited liability company (hereinafter referred to as "LLC") formed in 2005 under the laws of the State of Maryland. The Debtor's members, and their purported ownership interests,[1] are as follows: Dr. Alfred Greenberg ("Greenberg"), Halina Greenberg (together with Greenberg, the "Greenbergs"), jointly 48 1/3%, Catherine Erickson-File ("Erickson-File"), 2 1/3%; Christine McNelis ("McNelis"), 1%, V. Charles Donnelly ("Donnelly"), 24 1/3%; and Deborah A. Steffen ("Steffen"), 24% (Donnelly and Steffen are referred to collectively as the "Movants").

On June 1, 2005, the members executed the Operating Agreement of Solomons One, LLC (the "Operating Agreement"). The Operating Agreement provides that the Debtor was formed, *inter alia*, "to acquire, purchase, lease, sell and develop the real property located at 14538 Solomons Island Road, Solomons, Maryland . . . ." Operating Agreement, §2.3.

The Operating Agreement contains several provisions governing the consent rights of the members, as follow:

> 2.3. Purposes. The purposes for which the Company is formed are (a) to acquire, purchase, lease, sell and develop the real property located at 14538 Solomons Island Road, Solomons, Maryland (generally known as the "Harmon House" property) *and such other properties the Members unanimously agree to acquire . . . .*

*Id*. at §2.3 (Emphasis added).

---

[1] The Greenbergs, Erickson-File and McNelis contend that Donnelly and Steffen involuntarily withdrew from the Debtor by filing an action for dissolution and by taking other actions. They argue that because Donnelly and Steffen were no longer voting members when the members met to consider filing a bankruptcy petition, the petition was approved by the unanimous consent of the remaining members. The court need not address this issue because it concludes the petition was properly authorized by a majority of the members in accordance with the operating agreement. In this Memorandum, references to Donnelly and Steffen as "members" and statements concerning their percentage ownership interests in the Debtor are without prejudice to the contention by the Greenbergs, Erickson-File and McNelis that Donnelly and Steffen have withdrawn from the Debtor.

> 5.1. Management. The Members, acting jointly, shall have the right to manage the business of the Company, including, but not limited to, establishing and reviewing rental arrangements concerning the Property, encumbering, pledging, conveying and otherwise dealing with any or all of the Property, borrowing funds (executing confessed judgment notes in connection therewith) and operating the Company business. *Management decisions shall be proved by majority vote of the members.*

*Id*. at §5.1 (Emphasis added).

> 5.2. General Manager. The Members may, from time to time, *by majority vote* designate a person or entity (who may be a Member) to act as the General Manager of the Company. The General Manager shall act at the direction of and authorization of the Members. When so directed and authorized, the General Manager shall have the power to execute, for and on behalf of the Company, any and all documents and instruments which may be necessary or desirable to carry on the business of the Company, including, without limitation, any and all deeds, contracts, leases, mortgages, deeds of trust, promissory notes, security agreements, and financing statements pertaining to the Company's assets or obligations.

*Id.* at §5.2 (Emphasis added).

> 5.3. The General Manager, or *a member designated by a majority of the members*, shall have physical possession of the books and records of the Company, shall give such notices, reports and advice to the Members as may, from time to time, be required or deemed advisable, and shall perform the necessary ministerial functions of the Company.

*Id*. at §5.3 (Emphasis added).

> 5.4. Meetings of the Members shall be held on five (5) days' notice or on such shorter notice as may be mutually agreeable to the Members, on the call of the General Manager, or *the call of Members having fifty percent (50%) or more of the Interests in the Company*. Notice of the time and place of each meeting shall be given in writing by the General Manager to each Member.

*Id*. at §5.4 (Emphasis added).

> 6.1. Restrictions on Members.  No Member, without the prior written consent *of the majority of all other members*, shall:
>
> A. Sell Assign, transfer mortgage, or pledge the Member's Interest in the Company [with certain exceptions].

> B. Assign, transfer, pledge, compromise, or release any claim of the Company except for full payment, or arbitrate or consent to the arbitration of any disputes or controversies involving the Company;
>
> C. Use the name, credit or property of the Company for any purpose other than a proper Company purpose;
>
> D. Expand the business of the Company;
>
> E. Admit a new member to the Company;
>
> F. Cause the merger of the Company with or into any other business entity; or
>
> G. Do any act in conflict with the Company business or which would make it impossible to carry on that business.

*Id*. at § 6.1 (Emphasis added).

> 8.1. Dissolution. The Company shall be dissolved upon the happening of any of the following events:
> * * *
> B. *Upon the unanimous written agreement of all Members*

*Id*. at §8.1 (Emphasis added).

> 10.8. *Entire Agreement; Amendment*. . . . This Agreement may not be amended or modified *except with the consent of all Members*.

*Id*. at §10.8 (Emphasis added).

*The Debtor's Assets and the Bankruptcy Filing*.

The Debtor entered into a joint venture with McNelis to purchase the real property identified in the Operating Agreement, 14538 Solomons Island Road, Solomons, Maryland (the "Property"). In August 2005, the Debtor acquired a seventy percent fee simple interest in the Property and McNelis acquired a thirty percent fee simple interest. The Property includes a commercial office building, which is leased out to several businesses, and a small cottage, which is leased out as a residence.

Branch Banking and Trust Company ("BB&T") holds a first lien on the Property. The members of the Debtor are guarantors of the loan. According to the Debtor, PNC Bank, N.A.

may hold a second lien on the Property and members are personally obligated on the PNC loan either directly or as guarantors. The loans are in default, and the bankruptcy petition was filed to stay a hearing scheduled for August 23, 2013, in BB&T's state court proceeding to liquidate its obligation.

On August 21, 2013, in anticipation of the hearing, the members of the Debtor held a meeting to consider whether to file a bankruptcy petition. The Greenbergs, Erickson-File and McNelis, representing 51 2/3% of the member interests, voted in favor of the filing. The Movants, holding 48 1/3% of the interests, voted against the filing. The petition was filed based on the authorization granted at the August 21 meeting. The Movants filed the motion to dismiss shortly after the filing.

*The Disputes Between the Member Groups.*

The motion to dismiss the bankruptcy petition is the latest in a series of disputes and legal actions initiated primarily by the Movants that date back to the time of the Debtor's default on the BB&T loan in February 2013. The parties have addressed these disputes at some length in this proceeding, and each alleges the other is acting in bad faith and in breach of their fiduciary duties. Because the court resolves the issue of the authorization required to file the bankruptcy petition primarily by reference to the Operating Agreement, these disputes are not especially pertinent to the resolution of the pending motion to dismiss. Accordingly, the court will only summarize them briefly here.

- *Donnelly, et al. v. State of Maryland, et al*. **Case No. 04C12001031 (Pier Rights Litigation)**

    On August 22, 2012, Donnelly, acting as counsel to the Debtor and other plaintiffs, filed a complaint for declaratory judgment and breach of contract against the State of Maryland and the Board of County Commissioners of Calvert

County after they denied a joint application to construct a commercial pier adjacent to the Debtor's Property. Docket No. 68-1 at 23-36. On July 16, 2013, the Circuit Court for Calvert County entered an order granting summary judgment in favor of the plaintiffs and declaring that the plaintiffs held contractual rights to construct piers on the Patuxent River adjacent to the Property. *Id.* at 37-38. On August 16, 2013, the Circuit Court for Calvert County entered a final judgment on the declaratory judgment. *Id.* at 40. The State and County have filed notices of appeals of the judgment. There is no dispute that this action was duly authorized by the Debtor.

- *Solomons One, LLC v. McNelis*, **No. 04C13000589, Circuit Court for Calvert County (Partition Action)**

    On May 2, 2013, Donnelly, acting as counsel, filed an action on behalf of Debtor seeking to partition the Debtor's 70% interest and McNelis' 30% interest in the Property. The complaint sought to partition the Property into two buildable parcels stating that the parties "cannot agree[] upon a common strategy for development of the Property, the investment or the marketing of the Property." *Id.* at 47. In the alternative, the complaint requests that the Property be sold. *Id.* The Greenburgs, McNelis and Erikson-File state in affidavits that the partition action commenced without their knowledge or consent and that they never authorized or consented to the partitioning of the Property. *Id.* at 2-3; 68-2 at 2-3; 68-3 at 2-3; 68-4 at 2-3; 68-5 at 2-3.

- *Donnelly, et al. v. Solomons One, LLC*, **No. 04C13001068, Circuit Court For Calvert County (Petition for Dissolution)**

On August 5, 2013, the Movants filed a petition for dissolution, an accounting and the appointment of a receiver. Docket No. 68-1 at 68. The petition alleges that the other members are in breach of their fiduciary duties, engaged in self dealing, conducted secret negotiations with the note holders for the Property and used funds of the Debtor without authorization. *Id*. at 69-70. The bankruptcy petition stayed this action.

- ***Donnelly, et al. v. Erickson-File, et al*., No. 04C13001175, Circuit Court for Calvert County**

    On August 21, 2013, the Movants filed a complaint in the Circuit Court for Calvert County against the other members of Debtor alleging breach of fiduciary duty, concealment/non-disclosure, civil conspiracy, tortious interference with prospective advantage and fraud.

- **Assignment of Contract Rights to Construct a Pier**

    Steffen as "Operating Manager of Solomons One, LLC" and Donnelly as a "member and counsel for Solomons Two, LLC [sic]" executed an Assignment of Contract Rights with a stated date of execution of December 4, 2012. *Id*. at 63. The assignment states that it assigns Debtor's contract pier rights to Donnelly to hold in trust as trustee to pursue litigation against the State of Maryland and Calvert County. *Id*. at 60-61. The assignment also establishes how recovery from the litigation is to be divided among the members and how attorney fees will be paid. *Id*. at 61. The assignment was recorded in the land records of Calvert County on May 16, 2013. *Id*. at 60. The Greenburgs, McNelis and Erikson-File state in affidavits that they learned of this purported assignment in the summer of 2013 and that they never authorized this assignment or for Donnelly to act as

7

trustee. *Id*. at 2-5; 68-2 at 2-3; 68-3 at 2-3; 68-4 at 2-3; 68-5 at 2-3. They also state that they never authorized Steffen to execute the assignment as "Operating Manager of Solomons One, LLC." Docket No. 68-1 at 5; 68-2 at 3; 68-3 at 3; 68-4 at 3; 68-5 at 3.

**Conclusions of Law**.

The parties agree that a corporate debtor must have the requisite authority to file a bankruptcy petition under applicable state law. They also agree that, in the absence of authority to file, the bankruptcy case is subject to dismissal. They disagree on whether the Debtor had the requisite authority to file the petition under Maryland law. Specifically, the parties dispute whether the Operating Agreement authorized the filing with the consent of a majority of the members' interests and whether recent amendments to the Maryland Limited Liability Company Act require the unanimous consent of the members to authorize the petition.

*The Operating Agreement*.

Under Maryland law, an "'[o]perating agreement' means the agreement of the members and any amendments thereto, as to the affairs of a limited liability company and the conduct of its business." Md. Code Ann., Corps. & Ass'ns §4a-101(p) (2007) (hereinafter referred to as "Md. Code"). An LLC's operating agreement is a binding contract whose terms governs the affairs of the LLC and sets forth the members' management and membership rights and duties. 51 Am. Jur. 2d Limited Liability Companies §4 (2013); *see* Md. Code §4a-402. Consequently, an LLC's operating agreement is interpreted in accordance with prevailing contract law. *See Condo v. Conners*, 266 P.3d 1110, 1115 (Colo. 2011) (finding that the LLC's operating agreement should be interpreted "in light of prevailing principles of contract law."); *see also In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of

8

contract, and the parties have wide contractual freedom to structure the company as they see fit."). Under Maryland law, "[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions." *Tomran, Inc. v. Passano*, 891 A.2d 336, 344 (Md. 2006).

Maryland follows the law of objective contract interpretation. *Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007); *see also Myers v. Kayhoe*, 892 A.2d 520, 526 (Md. 2006); *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999). When interpreting a contract, the court is tasked with determining "from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *General Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985). Under the principal of objective contract interpretation, "the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." *Blakehurst v. Baltimore County*, 807 A.2d 179, 187 (Md. Ct. Spec. App. 2002). "A contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 547 (Md. 2003). "The determination of whether language is susceptible of more than one meaning includes a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *Calomiris,* 727 A.2d at 363 (quoting *Pacific Indem. v. Interstate Fire & Cas.*, 488 A.2d 486, 488 (Md. 1985). Further, the Maryland Court of Appeals has stated that:

> A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.

9

*National Union v. Bramble*, 879 A.2d 101, 109 (Md. 2005) (quoting *DIRECTV, Inc. v. Mattingly*, 829 A.2d 626, 637 (Md. 2003).

Viewing the Operating Agreement in its entirety, the court concludes that a reasonable person could only understand it as requiring the consent of the majority of the member interests to authorize the filing of a bankruptcy petition.

The primary provisions that lead to this conclusion are §5.1 and §6.1. Section 5.1 expressly provides that "[m]anagement decisions shall be approved by majority vote of the members." Section 5.1 does not contain any limitations and makes clear that it addresses both ordinary course and extraordinary actions. Thus, a majority vote is required to encumber or sell "any or all of the Property." *Id*. Few actions could be farther outside the ordinary course of business for a single asset entity than selling its sole asset, and yet that is expressly authorized by majority vote. A majority vote also is required to borrow funds whether or not in the ordinary course of business, including executing confessed judgment notes. *Id.*

Section 6.1 strongly reinforces the majority rule agreement in §5.1. It provides that "no Member, without the prior written consent of the majority of all other members," shall take the numerous and extraordinary actions set forth therein. By implication, it establishes that, with the consent of the majority of members, a member may compromise a claim, use the Debtor's name or credit for purposes outside the business of the Debtor, expand the business of the Debtor, merge the Debtor with another entity, or do an act that would make it impossible to carry on the business of the Debtor. §6.1

Sections 2.3, 8.1 and 10.8 provide the only exceptions to majority consent. The unanimous vote of the members is required for the Debtor to acquire additional properties. §2.3.

Unanimous written agreement is required to dissolve the Debtor. §8.1. And unanimous consent is required to amend the Operating Agreement. §10.8

The foregoing provisions, read together, establish that any and all decisions with respect to the Property or the Debtor's operations or management require majority vote, but only the decisions to add an additional property, dissolve the Debtor or amend the Operating Agreement require unanimity. The decision to add an additional property would change significantly the nature of the Debtor's business as a single asset entity, while the decision to dissolve the Debtor obviously leads to winding up the affairs of the Debtor. And, of course, the right to amend the Operating Agreement carries with it the extraordinary ability to alter the very agreement that the parties established at the commencement of the Debtor. The Operating Agreement therefore sets forth a reasonable and sound governance agreement that dictates majority rule on all matters other than one which changes the nature of the Debtor, leads to its termination or changes the original agreement among the members as to how they would conduct the affairs of the Debtor.

Moreover, the Maryland Court of Appeals has held that the maxim "*Expressio unius est exclusio alterius*" or "the express mention of one thing implies the exclusion of another" is a well-settled rule of contract and statutory construction. *See Breslin v. Powell*, 26 A.3d 878, 891 (Md. 2011) (discussing this maxim in relation to statutory construction); *but see Walzer v. Osborne,* 911 A.2d 427, 436 (Md. 2006) (quoting *Hylton v. Mayor and City Council of Balt*., 300 A.2d 656, 664 (Md. 1972) (warning that the maxim is merely an auxiliary rule to assist in determining the intention where such intention is not manifest from the language used)). Thus the express mention of three actions in §2.3, §8.1 and §10.8 of the Operating Agreement

requiring greater than majority consent implies the exclusion of other actions that require similar consent.[2]

Several other provisions in the Operating Agreement support the conclusion that all matters require majority vote, other than as provided in §2.3 and §8.1.  A majority of members is required to select the General Manager, (§5.2), to designate the member who shall have possession of the books and records, (§5.3), and to call a meeting, (§5.4). While these provisions, standing alone, might not lead to the conclusion that a majority vote is required to authorize a bankruptcy petition, they do serve as a further indication that the parties agreed that majority rule was the norm except as expressly provided.

Movants argue that the majority consent requirement of §5.1 and §6.1 only applies to ordinary course transactions.  Their view is belied not only by the language of those sections, as discussed above, but is at odds with admissions they made in prior court proceedings.  In the Petition for Dissolution and Appointment of Receiver, Case No. 04C13001068 described above, the Movants stated

> It is no longer reasonably practical to carry on the business of Solomons One, LLC in *conformity with the members agreements establishing majority decisions on major issues*, in keeping with the requirements of the Operating Agreement . . . .

---

[2] It could be argued that §2.3 and §8.1 create an ambiguity with §6.1.D and §6.1.G, respectively.  Section 2.3 requires unanimous consent for the Debtor to acquire other properties, while §6.1.D by implication allows a member to expand the business of the Debtor with the consent of a majority of the members.  Section 8.1 requires unanimous consent to dissolve the Debtor, while §6.1.G by implication allows a member to do an act that would make it impossible to carry on the business of the Debtor with majority consent.  The court need not decide whether these provisions can be reconciled.  *See National Union,* 879 A.2d at 109 (quoting *DIRECTV, Inc. v. Mattingly*, 829 A.2d 626, 637 (Md. 2003) ("if reasonably possible, effect must be given to each clause . . . so that a court [does not] . . . disregard[] a meaningful part of the writing")).  It is unnecessary to turn to legal principles governing interpretation of contracts unless the ambiguity exists over the matter at issue.  *See Calomiris*, 727 A.2d at 366.  Ambiguity in one contractual term or clause may not be used "to gain the admittance of extrinsic evidence to contradict other terms or clauses in the contract that are unambiguous." *Id*.

Docket No. 68-1 at 71 (emphasis added).  Each Movant personally signed the petition.  *See id*. at 73.  Thus, Movants' position in this court that the Operating Agreement only allows for majority decisions on ordinary course transactions is inconsistent with their verified petition.

In sum, the court concludes that a reasonable person in the position of the members at the time they adopted the Operating Agreement would have understood that majority consent was required to authorize a bankruptcy filing.[3]

***The Maryland Limited Liability Company Act***.

The Maryland Limited Liability Company Act (the "Act") was amended effective October 12, 2013.  The Movants contend that the amendments to the Act require unanimous consent of the members to file a bankruptcy petition.  This court disagrees.

A fundamental policy expressed in the Act is "to give maximum effect to the principle of freedom of contract and the enforceability of operating agreements."  Md. Code §4A-102.  Thus, members may enter into an operating agreement "to regulate or establish any aspect of the affairs" of the company, including provisions establishing "the manner in which the business and affairs of the limited liability company shall be managed, controlled, and operated . . . ."  *Id*. at §4A-402(a)(1).

The Act does not change the conclusion reached by the court that the bankruptcy petition was properly authorized by a majority of the members' interests.  Although the Act requires unanimous consent of the members to authorize a bankruptcy filing, that provision is expressly

---

[3] The Movants allege that Erickson-File and McNelis have a conflict of interest with the Debtor and therefore their votes in favor of the bankruptcy petition should be disregarded.  The conflict exists, according to the Movants, because McNelis is a co-owner of the Property and Erickson-File is a "partner" of McNelis, apparently in one or more other investments.  The Movants cite no authority for this proposition or additional facts from which it could be determined that a conflict exits.  The Movants, however, proffer that that the members of the Debtor are generally also members in another entity, Solomons Two, LLC.  Thus if being a "partner" in other investments constitutes a conflict of interest, it would appear that most, if not all, of the members of the Debtor are conflicted since they are "partners" with Erickson-File or McNelis. The point seems hardly worth mentioning.  Further, because the petition was approved by more than 50% of the members without regard to McNelis's vote, the court need not address the claim that she holds a conflict of interest with the Debtor because she is a co-owner of the Property.

13

qualified by "unless otherwise agreed." *See id*. at 4A-403(a), (d)(2). Under the Act, the phrase "unless otherwise agreed" means unless the members have otherwise agreed in the articles of organization, the operating agreement or in a separate unanimous consent of the members. *Id*. at 4A-101(t). Thus, the agreement by the members of the Debtor that all decisions would be made by majority consent except for those provided in §2.3, §8.1 and §10.8 is given effect under the Act.

The Act provides great flexibility to members of LLCs in the creation of their governance documents. While members must file articles of organization, those articles are required to contain only the name and address of the LLC and the resident agent, and any other provision that the members elect to include. *Id*. at 4A-204(a). It "is not necessary to set out in the article of reorganization any of the powers enumerated in [the Act]." *Id*. Similarly, the members "may" (but are not required to) enter into an operating agreement that governs the management and affairs of the company. *Id*. at §4A-402(a). Members also may "otherwise agree" to governance requirements in a separate written consent outside of the articles of organization or the operating agreement. *Id*. at §4A-101(t). The provision on which Movants rely, Md. Code §4A-403, sets out consent requirements for various actions by the company that are not "otherwise agreed." These include a call for a members meeting (at least 25% consent); decisions concerning the affairs of the company (at least 50% consent); disposing of all or substantially all of the property or approving a merger (at least 75% consent); and filing a bankruptcy petition or assigning the company's property in trust for the benefit of creditors (unanimous consent). *Id*. at §4A-403(b), (c), (d)(1) and (d)(2).

Viewed in this light, Md. Code §4A-403 does not alter the outcome of this dispute. Members have the "freedom of contract" to include consent requirements in the articles of

organization, the operating agreement or other written agreements. When they choose to exclude an agreement on such requirements, the Act controls. Where, as here, the members set forth their understanding in the Operating Agreement, "maximum effect" is given to their agreement. *Id*. at §4A-102.

**Conclusion.**

For the foregoing reasons, the court will deny the motion to dismiss. A separate order will follow.


cc: Debtor
    Counsel for Debtor
    V. Charles Donnelly
    Counsel for Deborah Steffen
    Counsel for Dr. Alfred Greenberg and Halina Greenberg
    Counsel for Catherine Erickson-File and Christine McNelis
    United States Trustee

**END OF MEMORANDUM**